Lynn **MOODIE**, Plaintiff–Appellant, Cross–Appellee,

v.

**SCHOOL BOOK FAIRS, INC.**, a corporation, Defendant–Appellee, Cross–Appellant.

Nos. 88–3442, 88–3493.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1989.

Decided Nov. 9, 1989.

David Goluba, Ripon, Wis., for Lynn Moodie.

Andrew O. Riteris, David V. Meaney, Joshua L. Gimbel, Michael, Best & Friedrich, Milwaukee, Wis., for School Book Fairs, Inc., a Corp.

Before BAUER, Chief Judge, WOOD, Jr., and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

The Wisconsin Fair Dealership Law, Wis. Stat. ch. 135 ("WFDL"), requires a 90 day notice and cure period and good cause for termination of "dealerships" in Wisconsin. This case presents two issues under the WFDL: (1) Does the relationship at issue qualify as a dealership; and (2) Was the district court clearly erroneous in its determination of damages for termination of a dealership without notice.

Defendant School Book Fairs ("SBF") is in the business of selling books to school children through book fairs set up at schools around the country. A book fair is a school sponsored event through which books are sold to students for educational purposes or for fundraising. SBF supplies the books which are sold to the students by the parents or school officials supervising the fair.

Moodie's job was essentially to deliver the books to the book fairs. Under his contract with SBF, Moodie was designated exclusive area "distributor" for 13 counties in Wisconsin and was responsible for delivering books to three schools a day within that area as well as rescheduling those schools for future fairs. Additionally, he would resupply the schools with books from his inventory, and pick up the unsold books after the fairs were over.

To perform his functions, Moodie was required to maintain a place to store the books (though title to the books remained with SBF) and a truck to haul the trailer which contained the books. Moodie built a customized, waterproof shed, at a cost of about $20,000, to hold the books and spent over $26,000 on three different trucks[1] to fulfill these requirements. The district court also found a significant investment in "goodwill." In the course of performing his duties, Moodie also had occasion to use business cards printed with the SBF trade-

---

[1] There is some question as to whether amounts spent on non-firm-specific items such as trucks should count towards amounts spent on a dealership. *See infra* at p. 742. Moodie may very well have bought the trucks anyway: during the three months of the year which he did not work for SBF, he ran a hauling business which used the same trucks. In addition, the trucks have some salvage value on the open market as they are not firm-specific. Therefore, the amounts counted towards the dealership, if any, should at most be the difference between those amounts he spent above and beyond what he would have spent anyway and the salvage value of the trucks.

mark, which were generally supplied by SBF.[2] He also used instructional pamphlets and order forms printed with the SBF trademark. He did not, however, spend any money on advertising.

Moodie delivered books for SBF for almost five years. During that time, he worked at this job nine months out of the year at a pace of 70 hours a week. All of his income during those nine months was derived from commissions from his book deliveries and from rescheduling fairs.

There were two events leading up to Moodie's eventual termination. First, at some point in time, SBF requested that Moodie increase his workload from three to four deliveries a day. Later, Moodie was required by SBF to come "on-line" with a computer system provided by SBF, which involved signing a lease agreement for the computer. Moodie was reluctant to make either of these changes and adamantly refused to sign the lease agreement, although he did state that he would agree to use the computer subject to a lease renegotiated on his terms. After a series of attempts were made to make him comply with the requests, SBF terminated Moodie without a formal 90–day notice and cure period as required under the WFDL.

■ Moodie brought suit against SBF in Wisconsin state court for money damages claiming he was a dealer under the WFDL. The case was removed to federal district court based on diversity jurisdiction. The district judge granted partial summary judgement to Moodie holding that Moodie was a dealer and that he had been terminated without notice in violation of the WFDL. A trial was held to determine the extent of the damages. Moodie presented an expert witness who claimed that Moodie could have worked for another twenty years delivering books. The expert calculated that the present discounted value of the difference between what he would have earned during the 20 year period working

for SBF and what he could earn having been wrongfully terminated was, after taxes, about $206,000.[3] SBF presented evidence that the value of the "distributorship" was about $6,500 on the market. The district judge, rejecting both of these theories, awarded Moodie $7,155, representing lost profits during the required 90 day notice period based on a finding that Moodie would have remained employed only for that required period as he adamantly refused to sign the computer lease agreement, which constituted good cause for dismissal.

Both parties appeal this decision. Moodie, appealing the damages award, claims that he is entitled to the 90–day notice period as a matter of law and the trial court was not entitled to determine that he would not have cured the defects in that period. In addition, Moodie claims that even if the court could make that determination, it did so erroneously, i.e., there was no good cause for dismissal. SBF, on cross-appeal, claims that Moodie was not a dealer. It argues, in essence, that Moodie was merely a delivery person and, therefore, an employee, and not a true dealer as defined by the WFDL. For the reasons stated below, we reject the claims of both parties and affirm the district court.

A.

To determine if Moodie was a dealer, we turn directly to the definition of the term "dealership" in the WFDL. A relationship must exhibit three characteristics to be considered a dealership within the WFDL. It must contain: (1) a contract, which is either express or implied; (2) "by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol;" (3) "in which there is a community of interest." WFDL § 135.02(3).

2. In general, SBF supplied the cards, but at times Moodie, with the approval of SBF, printed his own cards with the SBF trademark.

3. Moodie has increased the amount he is asking for on appeal to $332,025. As we are not triers

of fact, we are in no position here to award damages on theories not presented below. *See Garcia v. Daniel,* 490 F.2d 290, 292–93 (7th Cir. 1973).

Since its enactment, courts have wrestled with this definition.[4] "The dilemma courts face in resolving this question is formulating a definition sufficiently broad to encompass non-traditional business relationships which in fact fall under the dealership rubric, yet restrictive enough to avoid 'including every vendor/vendee relationship under the protective veil of ch. 135....'" *Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (1987) (quoting *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 769, 300 N.W.2d 63 (1981)). In each case, the facts must be carefully examined for indicia of dealerships. *See Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987) (requiring examination of ten different factors in each case to determine if the requirements for a dealership are met).

The stated purpose of the WFDL is to "protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Wis.Stat. § 135.025. The premise underlying this statutory purpose is that the grantor may be able to change the terms of the dealership towards his advantage after a firm-specific investment has been made in such items as training, specialized products, or goodwill. *See Moore v. Tandy Corp.*, 819 F.2d 820, 822 (7th Cir.1987); *Fleet Wholesale Supply Co. Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095, 1097 (7th Cir.1988) (Easterbrook, J. concurring). Once the dealer has made this investment, the grantor may extract concessions from the dealer through threats of termination. The purpose of the law, in this light, is to correct a "market failure" by protecting dealers who have made such an investment—those faced with inherently "superior bargaining power."[5] Wis.Stat. § 135.025.

The Wisconsin Supreme Court has apparently adopted this view of the statute. In *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60, 63 (1981), the court stated that "the law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "goodwill".... It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause or adequate notice." The Wisconsin Supreme Court more recently confirmed this view in *Zeigler* where it stated that the law requires "a person to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person." 407 N.W.2d at 879. *See also Bush*, 407 N.W.2d at 890 ("courts should consider the overriding principle of whether the business' status is dependent upon

---

**4.** One commentator has noted that in the period from 1974, when the law was enacted, to 1985, federal and state courts decided nearly 100 cases under this law with the greatest source of conflict involving whether a particular relationship falls within the meaning of dealership. Note, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law*, 1985 Wis.L.Rev. 155, 156.

**5.** This explanation, however, is incomplete. If dealers have this information prior to making their firm-specific investment, they can simply make a contract at that time that prevents the grantor from wringing concessions later. (The WFDL, in essence, mandates such a contract.) The legislature did not indicate in the words of the statute that it believed this information was unavailable to dealers. Moreover, if this is the underlying problem, the legislature could have less intrusively dealt with the problem by mandating the supply of the information. In addition, any grantor who engaged in this practice would quickly find that it is difficult to attract new dealers as its reputation became known.

An alternative, perhaps more cynical, explanation is simply that dealers and not employees or independent contractors had sufficient political clout to have a remedial law passed in their favor. *See Moore*, 819 F.2d at 822. Remedial statutes such as the WFDL, under this view, must be viewed as private contracts with the benefits of the contract to be accorded to the proper group only insofar as the bargain struck grants these benefits. There is no indication that the Wisconsin courts have adopted this view, *see, e.g., Foerster v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60 (Wis.1981); *Zeigler*, 139 Wis.2d 593, 407 N.W.2d 873, and therefore, we are not free to adopt it. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny.

the relationship with the grantor for its economic livelihood.")

With this interpretation of the statute in mind, we apply this law to the facts at issue. Our standard of review is well established. We review the district court's determination of a summary judgment motion *de novo*, using the same standard of decisionmaking as that employed by the district court. *See Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1299 (7th Cir.1989). SBF concedes that there is no genuine issue of material fact, and accordingly, we must determine whether Moodie qualifies as a dealer as a matter of law under the three requirements of the WFDL. Fed.R.Civ.P. 56(c).

The first requirement, a contract between the parties, is not in dispute. Indeed, in virtually every employment relationship there is an express or implied contract between the parties. A written contract was present here.

■ The second requirement mandates that to qualify as a dealer, Moodie either sell SBF's products or services, use their trademark, or distribute their products. Applying this test, it is clear that Moodie did not sell books, so he cannot satisfy the sales prong of the test.[6]

■ Moreover, Moodie had only *de minimus* use of SBF's trademark, which is not sufficient to satisfy the WFDL. In *Foerster*, 105 Wis.2d 17, 313 N.W.2d 60, an alleged dealer was provided with business cards and brochures by the grantor. The Wisconsin Supreme Court held that this was not a sufficient "use of a trademark" for the purposes of the WFDL, finding that in light of legislative intent, "it is eminently clear that there must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company before such representatives are 'dealerships.'" *Id.* 313 N.W.2d at 67. The court further stated that a dealer does

make sufficient use of a trademark where "the trademark of the grantor or of the dealership is often prominently displayed for several purposes, including as an implicit guarantee of certain quality of product and service," or in other words, where the alleged dealer has made a substantial investment in the trademark. *Id.* 313 N.W.2d at 66; *see also Aida Engineering Inc. v. Red Stag Inc.*, 629 F.Supp. 1121 (E.D.Wis.1986). The rationale behind this holding is that *de minimus* investment in a trademark is not sufficient for the alleged dealer to be "over the barrel" so as to warrant protection under the WFDL. As the WFDL protects dealers who face inherently superior bargaining power, those dealers with only a *de minimus* investment in the grantor's trademark are not implicated.

We believe *Foerster* is controlling here. Moodie used his business cards much like the alleged dealer in *Foerster:* to identify himself as the agent of SBF. Although Moodie at times printed his own cards, he did not prominently display the logo as a implicit guarantee of quality and did not spend money on advertising. Moodie lacked the necessary investment in SBF's trademark to give SBF an "inherently ... superior bargaining position." Wis.Stat. § 135.025. We therefore find that Moodie's *de minimus* use of SBF's trademark is not sufficient to meet the dealership requirements of the WFDL.

Finally, we must decide if Moodie distributed SBF's products. The Wisconsin courts have not yet addressed when a party should be held to "distribute" goods or services. Indeed, the *Foerster* court explicitly refrained from considering the issue as applied to manufacturer's representatives. 313 N.W.2d at 66–67. Consequently, we must construe the meaning of "distribute" as we believe the Wisconsin courts would if the issue were before them. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

---

**6.** Moodie was granted the right to reschedule fairs, which is the equivalent to selling. If, however, this is the sole basis upon which Moodie is considered a dealer, then the damages would be limited to damages caused by termination of this right, which would be minimal. It is therefore necessary to consider whether Moodie's activities include the right to distribute or the right to use SBF's trademark.

In Wisconsin, "it is a well-established rule of statutory construction that it is improper to resort to extrinsic aids for the purpose of statutory construction if the meaning of the statute is clear and unambiguous. *Foerster*, 313 N.W.2d at 62. *See also Kania*, 300 N.W.2d at 71. There is no need for intrinsic aids here: the meaning of "distribute" is clear and unambiguous. Moodie stored the books at his premises and delivered them to their final point of sale, setting up the books in the shelves from which the final consumer, the students, would choose their purchases. This is sufficient. In fact, SBF implicitly acknowledged that Moodie distributed goods by naming him the area "distributor."[7] Moodie, therefore, distributed goods and satisfies the second prong of the test for dealership.

It remains to be determined whether Moodie satisfies the "community of interest" requirement. The WFDL defines "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." WFDL § 135.02(1). This definition, however, is singularly unhelpful—on its face it makes no distinction between dealers and non-dealers. Employees and independent contractors have financial interests in the business, often as much or more than dealers. Indeed, virtually anyone connected to the business has such an interest.

Given the rationale for the WFDL, however, the meaning of this requirement is apparent: it is where courts are to examine the relationship for indicia of a sufficient firm-specific investment. In *Ziegler*, the court detailed a nonexclusive list of ten characteristics of the relationship which help determine if such an investment is likely to be present. These factors are: (1) how long the parties have dealt with each other; (2) the extent and nature of the obligations imposed on the parties in the contract or agreement between them; (3) what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; (4) what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; (5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer; (6) the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); (7) the extent and nature of the alleged dealer's financial investment in inventory, facilities and goodwill of the alleged dealership; (8) the personnel which the alleged dealer devotes to the alleged dealership; (9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; and (10) the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. 407 N.W.2d at 879–880. Each and every factor need not be present to meet this test. Rather, the facts, taken as a whole, as measured by these factors, must indicate that the alleged dealer warrants protection under the WFDL. *Id.*

Applying the *Ziegler* test, it is evident that there was a community of interest between Moodie and SBF. Moodie had a significant firm-specific investment in both goodwill and in specialized materials. The amounts he spent on the customized shed and building goodwill are not recoverable on the market. In addition, some portion of the amounts spent on the truck are also not recoverable. Therefore, SBF had Moodie "over the barrel" at least as far as Moodie had made these investments in SBF. In addition, Moodie worked for SBF for over 5 years and derived all of his income for nine months of the year from SBF. Moodie had been granted exclusive territory of fourteen counties, employed two part-time helpers, and used SBF stationery and business cards. Applying the *Ziegler* criteria to these facts, we conclude that Moodie satisfied the community

---

**7.** While the name the parties give the relationship is not controlling, it may be considered as evidence of how the parties perceived the relationship. *See Aida Engineering,* 629 F.Supp. 1121, 1126 (E.D.Wis.1986).

of interest requirement and therefore, Moodie was a dealer.[8]

### B.

Having concluded that Moodie was a dealer, we can now turn to the question of proper damages for termination without notice. The district court found, after hearing testimony, that Moodie's employment would have lasted only 90 days longer, (the required notice and cure period before termination) because Moodie would have refused to sign the computer lease agreement during the 90 day period, and that this constituted good cause for termination. The court then calculated the number of book fairs scheduled during that time and multiplied by the average commission per book fair. Adjusting for mitigation and taxes, the court granted damages of $7,155 plus costs and attorney's fees.

Moodie raises several objections to this determination. First, he contends that failure to sign the computer lease agreement did not constitute good cause for termination. Good cause is defined in the WFDL as "failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor ...; or bad faith by the dealer." Wis.Stats. § 135.02(4)(a) and (b). Moodie argues that the computer lease agreement was unconscionable and therefore not a reasonable requirement and alternatively, he asserts that failure to sign the agreement did not constitute a failure to substantially comply with the grantor's requirements. Finally, he claims that the district court could not, as a matter of law, find that Moodie would not have cured his

deficiency had he been given the chance. We find these arguments to be without merit.

■ To support his claim for unconscionability, Moodie points to two aspects of the contract. First, the contract contains several liability disclaimers as well as indemnification provisions. Second, the lease requires the lessee to pay attorney's fees incurred in enforcing the lease. The parties cite different standards for unconscionability under Florida law, which is the law specified by the contract.[9] Moodie, citing *Kohl v. Bay Colony Club Condominium Inc.*, 398 So.2d 865 (Fla.App. 4th Dist.1981) claims that the Florida courts require only that the contract be unreasonable and unfair. SBF, on the other hand, citing *Garrett v. Janiewski*, 480 So.2d 1324 (Fla.App. 4th Dist.1985) claims that the contract must be "shocking to the conscience" or "monstrously harsh." We need not, however, decide which standard the Florida courts would apply because the lease agreement does not even satisfy the lesser of the two—it is not unreasonable or unfair. Disclaimers of warranties are standard in many commercial agreements. Simply because the contract contains such a provision does not make it unconscionable. The same can be said of the exculpatory clause. In addition, Moodie points to no Florida case where similar provisions were held to make a contract unconscionable. While Moodie may not feel that the contract is advantageous for him, it certainly is not unreasonable.

■ Moreover, we believe failure to sign the agreement constituted a failure to com-

---

**8.** This holding is consistent with the Wisconsin Supreme Court's holding in *Kania v. Airborne Freight Corp.*, 300 N.W.2d 63 (1981). That case held that a local cartage service did not satisfy the community of interest requirement because, among other things, the owner did not receive a percentage share of the grantor's revenues, and was not subject to risk of loss, as he was paid on a weekly basis regardless of the grantor's revenue. Additionally, he conducted his own independent cartage business at the same time in the same trucks and displayed his own logo on the trucks. *Id.* Moodie, however, was paid on commission. He was subject to the risk of loss because he was not paid if the schools failed to

pay SBF. Moreover, he did not run an independent business at the same time, and displayed SBF's logo rather than his own. The relationship in *Kania*, therefore, is significantly different than the relationship at issue here and *Kania* is not controlling.

**9.** Under the WFDL, Wisconsin courts may hold that Wisconsin law governs all contracts concerning Wisconsin dealerships. *See Bush*, 407 N.W.2d at 886. As Florida and Wisconsin law approach the matter of unconscionability in an identical manner, choice of law concerns are not implicated.

ply substantially with reasonable requirements. A company is entitled to maintain uniform contract terms with its many dealers. Without a lease, SBF could not know the terms by which Moodie agreed to use the computer. As noted by the district court, the lease was not unreasonable, and a refusal to sign the lease was an "adamant rejection of a company directive constitut[ing] good cause for termination." *Moodie v. School Book Fairs Inc.*, 694 F.Supp. 1372, 1372 (E.D.Wis.1988).

Finally, Moodie contends that the district court could not, as a matter of law, find that he would not have cured his deficiency had he been given notice. In other words, Moodie argues that the district court was not even entitled to consider this question—termination without notice entitles the dealer to the same damages as if he were terminated without good cause.

■ We cannot agree with Moodie. The WFDL provides for monetary or injunctive relief and Moodie was entitled to choose his form of relief. If Moodie had chosen injunctive relief, he would have merely been entitled to reinstatement subject to a 90–day cure period. Moodie would still have had to face either curing the defect or termination. He would have us avoid this result by demanding that the district court treat him as if he had been wrongfully terminated. We find no support for this in the WFDL. The statute merely states that a suit may be brought for "damages sustained by [the dealer] as a consequence of the grantor's violation [of the statute]." Wis.Stat. ch. 135.06. To determine the damages sustained, it is necessary for the court to predict the profits that Moodie would have sustained without the violation, which implicitly includes a determination that Moodie would have, or would not have, cured the defect. Indeed, Moodie implicitly asked the court, through an expert witness, to do just this: to find that Moodie would have cured the defect. The only real disagreement Moodie has

with the trial court is that the trial court came to a different conclusion; the district court determined that Moodie would not have cured the defect while Moodie's measurement of damages assumes that he would have. He cannot avoid the fact that he did not substantially comply with a reasonable requirement by asking for money damages. Moodie's claim therefore is without merit and the trial court was correct in considering whether Moodie would have cured the defect.[10]

### C.

Accordingly, the judgment of the district court is AFFIRMED.

---

**10.** As we have held that the district was correct in determining that Moodie would not have cured the defect, we need not consider Moodie's final argument, namely that the district court

was clearly erroneous in determining that Moodie would not have continued working for another 20 years.