**BAY AREA PROPERTIES, INC., Plaintiff,**

v.

**DUTCH HOUSING, INC., Defendant.**

No. 03–C–154.

United States District Court, E.D. Wisconsin.

Feb. 13, 2004.

Richard J. Carlson, Silton Seifert Carlson & Gamble SC, Appleton, WI, for Plaintiff.

Brian W. McGrath, Matthew N. Andres, Foley & Lardner LLP, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

GRIESBACH, District Judge.

Bay Area Properties, a dealer in manufactured homes, brought suit against Dutch Housing, a home manufacturer, under Wisconsin's Fair Dealership Law, Wis. Stat. § 135.01 *et seq.*, (the "WFDL"). Bay Area alleges that Dutch illegally effected a "substantial change [in] the competitive circumstances" of their oral dealership agreement when Dutch failed to offer Bay Area an incentive program that it offered to other dealers. Wis. Stat. § 135.03. The plaintiff also alleges that Dutch illegally terminated its dealership without notice or good cause. The defendant seeks summary judgment on three separate grounds: (1) the plaintiff is not a dealer as that term is defined in the WFDL; (2) the oral dealership agreement alleged by plaintiff is void under the statute of frauds; and (3) the defendant did not violate the WFDL in terminating its relationship with the plaintiff. For the reasons stated herein, I conclude that the plaintiff is not a dealer and on that basis grant the defendant's motion.

## I. Background

Bay Area alleges that it was Dutch's exclusive dealer for the Marinette area market between 1996 and 2001. It claims that their oral agreement granted Bay Area an exclusive territory generally centered around Marinette and extending roughly from Green Bay in the south to Iron Mountain in the north. (Pltf. Br. at 18.) Dutch disputes the exclusivity provision, arguing that it rarely has exclusive arrangements with dealers and, in the unusual event that it does, the agreement would be in writing. (Kimmell Decl. ¶ 3.) In any case, between 1997 and 2002 Bay Area sold over $6.5 million worth of Dutch homes, as represented below:

|  | Bay Area's Total Sales | Sales of Dutch Homes | Dutch Homes as % of Total Sales |
|---|---|---|---|
| 1997: | $3.83 million | $1.29 million | 34% |
| 1998: | $5.27 million | $1.89 million | 36% |
| 1999: | $7.28 million | $2.0 million | 28% |
| 2000: | $6.96 million | $1.08 million | 16% |
| 2001: | $5.64 million | $289,000 | 5% |
| 2002: | $5.5 million | $100,000 | 2% |

(Carlson Decl., Ex. 16.) During the four-year period 1997–2000, Dutch homes comprised an average percentage of sales (sales of Dutch product divided by total sales) of nearly 27%. In 2001 and 2002, however, Dutch homes accounted for only 3.5% of Bay Area's total sales. This decline, as might be expected, is the basis of this lawsuit.

Bay Area blames the drastic decline on Dutch's sales manager, John Elliott, who did not allow Bay Area to participate in an apparently lucrative inventory replacement incentive program. Bay Area asserts that this was payback for a dispute Bay Area had with a customer over the customer's

windows.[1] Around the same time (the dates are not clear from the record), on January 12, 2001, a Dutch sales rep wrote to the plaintiff indicating her concern that Bay Area's inventory of Dutch homes was somewhat stagnant. In pertinent part, the letter reads: "Our records indicate in comparison to your year to date volume for 1999 and 2000 you are down 47.7% and down 62% in comparison to 1998. Your current stock is five 1999 models, three 2000 models, and no current 2001 models." (Andres Decl., Ex. B.) Some two months later, in March 2001, Dutch offered a more lucrative dealership to Bob's Homes, which is located only four miles away from Bay Area. Bay Area argues that these two events-the failure to allow Bay Area to participate in the incentive program and Dutch's new relationship with Bob's Homes-allowed customers to shop for Dutch products at Bay Area and then go "down the street" to Bob's Homes and buy the home at a cheaper price. (Pltf. Br. at 22.) Bay Area argues that its inability to participate in the inventory replacement incentive program affected its profitability so much that it went from making about a 5% profit to almost no profit by 2001. (Carlson Decl., Ex. 16.) These events, which occurred in early 2001, are at the heart of Bay Area's claim that Dutch "substantially change[d] the competitive circumstances of [its] dealership agreement without good cause." Wis. Stat. § 135.03.

With its relationship with Dutch on the rocks, Bay Area turned to Wick Homes, another manufacturer with whom it had already been working previously. In 2001 it agreed to an oral exclusive dealership agreement with Wick, and Bay Area sold some 36 Wick homes that year. In December 2001, Bay Area received another in a series of letters from Dutch. The December letter lamented Bay Area's low sales and threatened that Dutch would seek other representation in the area (which it already had in Bob's Homes). (Carlson Decl., Ex. 21.) In January of the next year, Dutch sent a letter requesting that both sides agree to "move on" with their businesses, i.e., end the relationship. (*Id.*) Finally, in July 2002, Bay Area received a letter indicating that Dutch would no longer sell any homes to Bay Area, thus terminating the relationship. (*Id.*)

## II. Wisconsin Fair Dealership Law

The specific legal issues presented here are 1) whether, and when, Bay Area constituted a "dealership" under the WFDL (that is, whether the WFDL applies), and 2) whether any of Dutch's actions violated the relevant provisions of the WFDL. Before addressing the first question, however, it is necessary to determine exactly *when* the plaintiff alleges that it was a dealership. The defendant focuses primarily on the official termination of the dealership in July 2002, which followed the official termination notice sent in December 2001. But it seems clear, as the plaintiff essentially concedes, that there was no community of interest between the parties by the time the defendant officially terminated the dealership. Bay Area had already actively solicited other exclusive relationships and its sales and inventory of Dutch homes was quite low. At termination, the relationship barely had a pulse. Bay Area asserts instead that the proper timeline for analyzing whether a dealership existed is the pre–2001 period before Dutch disallowed participation in the incentive program and began its relationship with Bob's Homes. That is, it argues that

---

1. Much is made of the facts of the customer dispute. The underlying facts do not, however, bear on the issues presented here, namely, whether Bay Area was a dealership for WFDL purposes and whether Dutch's actions violated that statute.

the defendant should not now be able to benefit from the lack of a community of interest in late 2001 because Dutch's own misdeeds brought about that very situation. Indeed, it claims, such a finding would turn the WFDL on its head. As Bay Area puts it:

By denying Bay Area an important inventory replacement incentive program in 2001 that was available to other Dutch dealers and then, shortly afterward, appointing another Dutch dealer in the Marinette market area only a few miles down the road from Bay Area with financial incentives unavailable to Bay Area, Dutch engaged in conduct that was expressly prohibited under the WFDL. Dutch altered the Bay Area dealership without good cause and without notice.

(Pltf. Br. at 13.)

Thus, because the events of early 2001 are the central foundation of the plaintiff's WFDL claims, it follows that the relevant time period to examine is the period *preceding*, rather than following (as the defendant suggests), the actions in 2001 that the plaintiff asserts violate the WFDL.[2] The statute defines a dealership as:

A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). The specific issue of dispute is whether Bay Area and Dutch shared a "community of interest" in the business. "Community of interest" is defined by the statute as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1).

Despite this "vague and unhelpful" statutory definition, *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992), the Wisconsin Supreme Court has declined to create a "bright line" rule. Instead, the Court has adopted a totality of the circumstances test that looks to two "guideposts" which are to be assessed by considering ten or more "facets" of the parties' relationship. *Ziegler Co. v. Rexnord, Inc.*, 407 N.W.2d 873, 139 Wis.2d 593, 604–606 (1987). In adopting such a test, the Wisconsin Supreme Court has deliberately chosen the flexibility that a multi-faceted determination made on a case-by-case basis allows over the predictability and certainty that a more concrete test would provide. *Id.* at 606, 407 N.W.2d 873.

In determining whether a community of interest existed as of early 2001, I begin with the Wisconsin Supreme Court's decision in *Ziegler*, 407 N.W.2d 873, 139 Wis.2d 593. In *Ziegler*, as just noted, the court set forth two "guideposts" to aid courts faced with the "community of interest" question: 1) whether the grantor and grantee of the alleged dealership had "a continuing financial interest in their business relationship," and 2) their "interdependence, the degree to which the dealer and grantor cooperate, coordinate their ac-

**2.** It would appear that the claims based on the events of early 2001, which the plaintiff argues constituted a substantial change in the competitive circumstances of the dealership agreement, might well be barred by the WFDL's one-year statute of limitations. The statute of limitations, however, was not raised as an affirmative defense and the defendant has not sought leave to amend its answer.

tivities and share common goals in their business relationship." *Id.* at 604–05, 407 N.W.2d 873. In assessing these guideposts, the *Ziegler* court held, courts should look to "a wide variety of facets, individually and in their totality, as evidenced in the actual dealings of the parties and in their contract or agreement." *Id.* The facets enumerated by the court include:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

139 Wis.2d at 606, 407 N.W.2d at 879–80.

These facets are nonexclusive and essentially create a "totality of the circumstances" test. Thus, the *Ziegler* court created a test with great flexibility, and it specifically rejected any kind of fixed percentage analysis because such an analysis "improperly truncates the court's inquiry into the relationship between the parties".

*Ziegler,* 139 Wis.2d at 603, 407 N.W.2d at 878.

■ Though there are no concrete benchmarks in this analysis, if any facet is more prominent than the others, it is the presence (or absence) of tangible grantor-specific financial investments made by the alleged dealer, or what some courts have referred to as "sunk costs." *Frieburg,* 978 F.2d at 399; *Sales & Marketing Associates, Inc. v. Huffy Corp.,* 57 F.3d 602, 606 (7th Cir.1995)("this circuit has recognized the totality of the circumstances approach adopted in *Ziegler,* and of those factors has concentrated on whether the grantee has made sizable investments which are grantor-specific and therefore not fully recoverable upon termination.") Thus, in *Sales & Marketing Assocs.,* 57 F.3d at 607, the court observed that "WFDL case law demonstrates that only a certain type of relationship is protected under it, and these cases all involve tangible financial investment." And, in *Moodie v. School Book Fairs, Inc.,* 889 F.2d 739, 744 (7th Cir.1989), the court noted that, "[g]iven the rationale for the WFDL, ... the meaning of this requirement is apparent: it is where courts are to examine the relationship for indicia of a sufficient firm-specific investment." *See also Moore v. Tandy Corporation,* 819 F.2d 820, 822 (7th Cir. 1987) ("To be a 'dealer,' you must have made a financial investment in the dealership.")

The first question, then, is whether Bay Area made any firm-specific investments in its relationship with Dutch. That is, are there any costs that Bay Area sustained that are "sunk" and rendered worthless by the lapsing of the parties' relationship? Bay Area states that between 1996 and 2000 it spent approximately $25,000 per year in the advertising of Dutch products. (Dettman Decl. ¶ 3.) Exactly what such advertising consisted of is unclear, since

Bay Area offers nothing more than the general estimate that about 25 to 30 percent of its total advertising was devoted to marketing Dutch homes, which is about the percentage of its sales that Dutch comprised. (*Id.*) Were these advertising expenses specific to Dutch homes? The record does not contain many clues, and Dutch's general manager expresses doubt about Bay Area's figures. (Kimmell Decl., ¶ 3.) But assuming that it did spend $25,000 annually on Dutch-specific advertisements, Bay Area ended up selling all of its Dutch inventory. Thus, it cannot be said that its $25,000 annual advertising budget was "sunk" because the expenses incurred by Bay Area did not go to waste after 2001. Even more telling, perhaps, is the almost negligible amount of money at issue. $25,000 would constitute less than one-half of one percent of Bay Area's annual revenues, a *de minimis* amount. *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 914 F.Supp. 296, 301 (E.D.Wis.1996) (sunk investments totaling 2% of company's annual sales were *de minimis* and legally insignificant in determining whether a community of interest existed).

Bay Area also argues that about 25% of its plant and equipment investments were devoted to Dutch, a percentage which would total approximately $150,000 per year. (Pltf. Br. at 5.) Even if this level of spending (approximately 2.5% of sales) would be above the *de minimis* level, there is no indication that the expenditures are somehow sunk costs. Instead, the expenditures are described as including outlays for "land, buildings, improvements, machinery and equipment." (*Id.*) Nowhere does the plaintiff explain how its equipment or machinery (to say nothing of the land and buildings) were Dutch-specific investments. In fact, the only evidence in the record before me indicates that none of Bay Area's equipment, parts, tools or facilities was specific to Dutch Housing or its products. (Kimmell Decl. ¶¶ 2, 5.) Dutch Housing did not require Bay Area to stock any Dutch Housing parts. (*Id.*) Thus, I do not find any evidence of the kind of firm-specific investments discussed in *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir.1989) or any of the numerous other cases addressing this issue.

Another facet to consider is the level of business undertaken by the two parties. Dutch makes much of the fact that Bay Area's sales of Dutch products in 2001 and 2002 only constituted between 2% and 5% of its business. But again, these are statistics arise after the events that the plaintiff claims violated the WFDL at the beginning of 2001. The more pertinent numbers reveal, as discussed above, that about 27% of Bay Area's business came from Dutch home sales between 1996 and 2000, though the figure for 2000 is only 16%. Dutch asks that I consider the decline in sales of its products (from 36% in 1998 to 16% in 2000) as evidence that there was no community of interest by the beginning of 2001. Bay Area explains, however, that 2000 was merely an "off year," with the implication being that one slow year should not count against it. In the abstract, I would not be inclined to hold a one-year decline in sales against a party claiming a community of interest. In this case, however, Bay Area's sales of Dutch products fell by almost half ($2 million to $1.08 million) between 1999 and 2000, a rather dramatic decline. Dutch is also able to point to the fact that Bay Area was dramatically *increasing* its business with a Dutch competitor over this same period. Specifically, Bay Area ordered 26 Wick homes in 1999 and 37 in

2000–a one-year increase of 42%.[3] (Susemihl Dep., Ex. 28.) Juxtaposed against the decline in Dutch sales, these numbers signal Bay Area's gradual trend away from reliance on the Dutch relationship *before* the events complained of occurred in 2001. Thus, in my view, the 2000 figure of 16%, rather than the 1997–2000 average of 27%, presents a more accurate snapshot of the level of business conducted by the parties around the time the disputes arose in early 2001.

The fact that Dutch accounted for 16% of its sales neither helps nor hurts Bay Area. Clearly the relationship was important to Bay Area (as it must be in any case in which the alleged dealer brings suit against the grantor), but a company's derivation of one-sixth of its revenues from another company does not rise to a substantial level of dependency, especially given the lack of grantor-specific investments noted above. Indeed, several cases have found no community of interest with much higher levels of sales. *See, e.g., Sales & Marketing Assoc., Inc. v. Huffy Corp.,* 57 F.3d 602, 606 (7th Cir.1995)(23% of revenues); *Kania v. Airborne Freight Corp.,* 99 Wis.2d 746, 300 N.W.2d 63 (1981)(80–85%); *Van Groll v. Land O'Lakes, Inc.,* 310 F.3d 566 (7th Cir.2002)(100% of sales); *Rakowski Distributing, Inc. v. Marigold Foods,* 193 F.3d 504 (7th Cir.1999)(100% of profits); and *Kornacki v. Norton Performance Plastics,* 956 F.2d 129 (7th Cir.1992) (75–80%).

It is also noteworthy that the weakening sales trend was corroborated by a declining inventory in Dutch products, a fact perhaps more damaging to Bay Area than its declining sales figures. By the end of 2000, Bay Area had in inventory only eight Dutch homes, five of which were 1999 models and three of which were 2000 models. In fact, this was the central complaint of the Dutch sales rep who wrote to Bay Area in a letter dated January 12, 2001. (Andres Decl., Ex. B.) Thus, the fact that Bay Area was not replacing its inventory with Dutch homes, even before the incentive program issue arose, tends to cast doubt on the strength and dependence which Bay Area now attributes to the relationship.

Other factors are either a wash or are not in evidence at all. The parties' relationship had lasted some four-plus years before Dutch disallowed certain incentives and began its relationship with Bob's Homes' Peshtigo facility. This period of time is neither particularly long nor short, but against the backdrop of Bay Area's gradual and voluntary shift away from Dutch homes, the four-year relationship is not probative of any level of dependence. Another factor to consider is the general scope of the agreement. The particular agreement here was oral, and, while the WFDL clearly covers oral agreements, the fact that the dealership agreement was not written suggests a certain deliberate informality about the arrangement. Thus, even accepting as true the plaintiff's characterization of the dealership agreement, there is no indication that the business relationship imposed a set of rigid requirements or obligations on either party. Nor is there any evidence of substantial involvement by

---

**3.** There appears to be a dispute about whether these numbers reflect sales of Wick homes or shipments from Wick to Bay Area. In its response to Dutch's proposed findings, Bay Area does little to illuminate the matter and does not provide its sales figures. (Bay Area Admitted, Disputed and Proposed Findings of Fact, ¶ 10.) Assuming that Bay Area is correct about its own sales data, however, the number of homes received into inventory (as opposed to sales) is perhaps even more indicative of the trend noted herein. Exhibit 16 to the Carlson Declaration also indicates that sales of Wick Homes rose from 17 in 1998 to 31 in 2000 and 2001.

Dutch in the business of Bay Area. The record contains a few brief letters from a Dutch sales rep, but nothing to suggest that the two parties had any kind of interdependence or systematic approach to sales. And, despite an unsupported proposed finding, there is no actual evidence that Bay Area was required to advertise Dutch homes as part of its agreement with Dutch Housing.(Bay Area Admitted, Disputed and Proposed Findings of Fact at 7 e.; Kimmell Decl. ¶ 3.)

Ultimately, Bay Area was a business whose sales of Dutch products constituted between 16% and 36% of its total sales prior to 2001. Dutch sales declined to 28% of Bay Area's total in 1999 and 16% in 2000, at the same time as sales of a competitor's homes increased substantially. By the end of 2000 its inventory of Dutch homes had dwindled, prompting a concerned letter from the Dutch sales rep in January 2001. Nor is there evidence of any sunk costs or substantial financial investments in Dutch-specific equipment or other expenditures. The parties maintained a relatively loose relationship and did not intermingle or have any substantial interaction other than ordering inventory. Based on this *gestalt* picture, I am satisfied that no community of interest existed between the parties by the beginning of 2001. Accordingly, the WFDL does not govern the relationship between Bay Area and Dutch Housing, and I need not address whether Dutch's actions in 2001 "substantially change[d] the competitive circumstances of a dealership agreement without good cause." Wis. Stat. 135.03.

Therefore, for the reasons stated herein, **IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED**, and this case is **DISMISSED**.