**JOHN MAYE COMPANY, INC.,**
Plaintiff–Appellant,

v.

**NORDSON CORPORATION,**
Defendant–Appellee.

No. 91–1112.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1991.

Decided April 8, 1992.

T. Michael Schober, Rodney W. Carter (argued), Schober & Radtke, New Berlin, Wis., for plaintiff-appellant.

James R. Scott (argued), Lindner & Marsack, Milwaukee, Wis., for defendant-appellee.

Before COFFEY and EASTERBROOK, Circuit Judges, and MORAN, District Judge.[*]

COFFEY, Circuit Judge.

The John Maye Company (Maye) appeals from the district court's denial of its request for a preliminary injunction under the Wisconsin Fair Dealership Law. Wis. Stat. §§ 135.01–.07. Maye sought to enjoin the Nordson Corporation (Nordson) from terminating it as a regional sales representative of Nordson products without good cause. The district court refused to grant the injunction because Maye was unable to demonstrate that it was a dealer under the statute; the district court found that Maye had neither a right to sell Nordson products nor a right to use Nordson's trademarks. Absent such a showing, Maye could not prove a reasonable likelihood of prevailing on the merits if the case went to trial, and so failed to meet the standard for a preliminary injunction. *John Maye Co., Inc. v. Nordson Corp.*, 753 F.Supp. 1451, 1456 (E.D.Wis.1990). We affirm.

## I. BACKGROUND

This case involves the Wisconsin Fair Dealership Law (WFDL) and the question of who qualifies as a "dealer" under the law. John Maye Company is a Wisconsin Corporation that sells packaging machinery, and Nordson Corporation is an Ohio corporation that manufactures packaging machinery. The two companies entered into a "Sales Representation Agreement" (Agreement) in May of 1987. On October 1, 1990, Nordson notified Maye that it was terminating the Agreement as of November 5, 1990 because it wanted to utilize a direct sales force in Maye's area. After receiving this notice Maye initiated a suit in state court, seeking both a preliminary and a permanent injunction prohibiting Nordson from ending the business relationship. Nordson then removed the case to federal court under diversity jurisdiction.

■ The Agreement designates Maye as Nordson's "representative" and requires it to "actively promote the sale and acceptance" of Nordson products in Wisconsin and the upper peninsula of Michigan. Maye's authority in this territory is non-exclusive. Agreement, ¶ 1. The Agreement requires Maye to promptly transmit customer orders or inquiries to Nordson for approval (¶ 4b); to provide assistance and advice to Nordson customers (¶ 4c); to bear all of its own expenses in performing the Agreement (¶ 4e); to recognize Nordson's exclusive ownership of its trademarks, trade names, and patents (¶ 4g); and to make sure that any price quotations contain Nordson's standard conditions of sale (¶ 6a). Nordson, in turn, agreed to identify prospective customers for Maye (¶ 5a) and to supply Maye with literature, samples, and other material necessary for promoting Nordson products (¶ 5b). The Agreement also gave Nordson "sole discretion" to accept or reject any order (¶ 7). Once a contract was formed Nordson shipped products directly to the customer (¶ 7), transferring title from itself to the buyer without going through Maye. For its efforts Maye received a commission on each sale it helped procure (¶ 8).[1]

[*] The Honorable James B. Moran, Chief Judge of the Northern District of Illinois, is sitting by designation.

1. Neither party mentions paragraph 18 of the Agreement, which states that "The Agreement shall be governed and construed in accordance with the laws of the State of Ohio." Apparently neither believes that the provision applies here. In any event, the strong policy concerns of the WFDL have led the Wisconsin Supreme Court to dishonor at least one such choice of law clause. *Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (1987). Noting that a state statute backed by a strong public policy will generally be applied even in the face of a contractual choice of law clause, the court found that:

> The statement of purpose and policy contained in the statute sec. 135.025(2), ... coupled with the explicit directive that the effect of the WFDL "may not be varied by contract or agreement" and "[a]ny contract or agreement purporting to do so is void and unenforceable to that extent ...," amply support this court's conclusion that a strong public policy is implicated in this case. Section 135.-025(3).... Therefore the court will not honor the parties' choice of law clause.

*Id.* at 644–45, 407 N.W.2d at 887–88 (footnote omitted).

Other aspects of the relationship were defined by the parties' course of dealing. For example, Nordson controlled how much it charged for products and decided whether to extend credit and the terms of any credit arrangement. If a customer was late on a payment, Nordson contacted both the customer and Maye, and Maye was expected to help collect the money. If an account remained unpaid, however, Nordson bore the loss.[2] Nordson assumed the risk for any damage to products during shipping. Maye did not have to pay any fee under the Agreement, and did not pay to advertise Nordson products. Instead, Nordson sent Maye sales brochures, pamphlets, and thank you notes, which Maye in turn delivered to customers. Though not required to do so, Maye also maintained an inventory of $1,000 to $1,500 in spare parts for Nordson machines. After a sale Maye performed both warranty and non-warranty work on Nordson machines, doing the warranty work for free but at times charging for non-warranty work. It also trained customers in the upkeep of Nordson equipment. Of its eleven employees, one spent almost all of his time promoting Nordson, while two others spent a portion of their time doing so.

■ After examining these facts the district court analyzed the WFDL to see if Maye had made the requisite showing of a reasonable likelihood of prevailing on its claim. *Maye*, 753 F.Supp. at 1454. To receive the protection of the WFDL, a party must first be a "dealer." A dealer has a contractual "dealership" with a grantor, through which it receives either the right to sell or distribute the grantor's goods or services, or to use its commercial symbols (e.g., a trademark or logo), and in which it shares a "community of interest" with the grantor. Wis.Stats. § 135.02(3). Because Maye was unable to demonstrate that it had either the right to sell Nordson's goods or the right to use its trademarks, the district court found that it was not a "dealer" without addressing the community of interest prong. *Maye*, 753 F.Supp. at 1457.

## II. ISSUES

Maye contends that it meets the WFDL's definition of a dealer because: (1) its many responsibilities under the Agreement, when taken as a whole, gave it the right to sell Nordson products, (2) its distribution of Nordson's promotional materials to customers gave it the right to use Nordson's trademark, and (3) the two companies shared a community of interest due to Maye's financial dependence on the relationship. Accordingly, Maye asserts that since it is a dealer, it has demonstrated a reasonable likelihood of prevailing at a trial regarding its alleged unlawful termination under the WFDL. We review the court's denial of a preliminary injunction deferentially, reversing only if there has been an abuse of discretion. *Dederich Corp. v. Eurozyme S.N.C.*, 839 F.2d 373, 375 (7th Cir. 1988).

## III. DISCUSSION

■ The WFDL is intended to protect small businesses (dealers) that deal in the goods or services of a larger company (grantor) and which, because of the link between their economic health and their ability to deal in the grantor's goods or services, are in an inferior bargaining position and could be unfairly exploited by the grantor. Wis.Stats. § 135.025(2). As the court stated in *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir. 1990), "We have deduced from the structure and history of the statute a central function: preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *See also Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 742 (7th Cir.1989) ("The premise underlying [the WFDL] is that the grantor may be able to change the terms of the dealership to his advantage after a firm-specific investment has been made in such

---

2. This is true except for the occasional small purchase (under $10,000) where Nordson agrees to ship goods without a purchase order based on Maye's assurances of the customer's creditworthiness. In such cases Maye is responsible for payment if the customer fails.

items as training, specialized products, or goodwill."). The fear is that dealers who are economically dependent on the grantor could be forced, for example, to pay more than the market price for the grantor's goods, or provide more services or bear more costs than less dependent dealers.

■ The statute attempts to achieve its goal by defining the protected business relationships in terms of their characteristics, intending to encompass those situations where grantors are most likely to have superior bargaining power and the ability to oppress dealers. A "dealer" is defined as "a person who is a grantee of a dealership situated in this state." Wis.Stats. § 135.02(2). A "dealership" must have the following elements:

1. a contract or agreement between two or more persons;
2. by which a person is granted
 a. the right to sell goods or services; [or]
 b. the right to distribute goods or services; or
 c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; and
3. in which there is a community of interest in the business of
 a. offering goods or services;
 b. selling goods or services; or
 c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

*Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 25, 313 N.W.2d 60, 64 (1981), quoting *Kania v. Airborne Freight Corp.,* 99 Wis.2d 746, 763, 300 N.W.2d 63, 70 (1981). The parties here agree that there is a contract, and so the first question we must address is whether Maye has satisfied the second part of the definition of a dealer by proving that it has either: (1) the right to sell Nordson products, or (2) the right to use Nordson's commercial symbols.[3]

*A. The Right to Sell*

■ In interpreting the WFDL, courts have concluded that the single most important factor in determining whether an alleged dealer has the right to sell a grantor's goods or services is the dealer's ability to transfer the product itself (or title to the product) or commit the grantor to a transaction at the moment of the agreement to sell. *Foerster,* 105 Wis.2d at 26, 313 N.W.2d at 64; *Wilburn v. Jack Cartwright, Inc.,* 719 F.2d 262, 265 (7th Cir. 1983). In this case the Agreement makes it clear that Nordson alone has the authority to accept or reject any offer by a customer. Agreement, ¶ 7. Maye admits that it lacks the unqualified right to commit Nordson to a sale, but argues that this is not dispositive. It asserts that courts should look at all of the circumstances surrounding a business relationship before deciding whether a company ought to be treated as a dealer under the WFDL, rather than just looking for the right to commit the grantor to a sale. Maye argues that, even though it could not commit Nordson to a sale, the many responsibilities Nordson delegated to it bring it within a liberal reading of the statute. Specifically, Maye points out that it: occasionally worked with Nordson to modify prices; assumed the credit risk on sales under $10,000 where it convinced Nordson of a customer's creditworthiness; was required to obtain the names of references for Nordson's credit checks; installed and serviced equipment after delivery; and maintained an inventory of spare parts for Nordson products. Moreover, Nordson *never* exercised its contractual power to reject a proposed sale. According to Maye these facts, when considered in their entirety, are sufficient to confer a right to sell, even in the absence of an ability to unilaterally commit the grantor to a sale.

■ As support for its argument, Maye relies on *Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883 (1987). Bush was a photographer for

---

**3.** Neither party argues that Maye had a right to distribute Nordson products, and thus we do not consider the issue.

National School Studios, a corporation engaged in taking school pictures. When National terminated his employment, Bush sued under the WFDL, claiming that he was a dealer who had been fired without good cause or the requisite written notice. In deciding whether Bush was a dealer the court first confronted the fact that Bush had been treated as National's employee for tax and unemployment compensation purposes. Conventional employer-employee relationships are not covered by the WFDL. *Id.* at 652, 407 N.W.2d at 891. The court held, however, that this labelling was not dispositive of Bush's status under the WFDL. Rather, the court stated that it "must consider the actual duties and responsibilities of each party in this business relationship to determine whether Bush was granted the right to sell National's portrait services." *Id.* at 653, 407 N.W.2d at 891; *cf. Aida Engineering, Inc. v. Red Stag, Inc.*, 629 F.Supp. 1121, 1127 (E.D.Wis.1986) ("The class of persons the WFDL was meant to protect is not to be defined by the accidents of informal business terminology."). The court then analyzed Bush's specific duties and responsibilities in his work for National.

Bush by contract was the sole representative of National in Northern Wisconsin. Pursuant to his contract Bush solicited business, set prices, collected payment, and at times extended credit. Moreover, he provided a substantial and integral part of the portrait service— photographing the students. As required by contract he purchased the film from National and bore fifty percent of the cost of advertising in the territory. In addition, Bush extensively used National's trademark and logo on a variety of solicitation materials as well as his letterhead and calling cards. *See Foerster*, 105 Wis.2d at 26 [313 N.W.2d 60]. As the court in *Foerster* recognized, the right to sell "generally includes authority to commit the grantor to a sale...." *Id.* In this case the record amply demonstrates that Bush had such authority. Based on these facts we conclude that Bush was granted the right to sell Na-

tional's services and to use its tradename and logo.

*Id.* at 654, 407 N.W.2d at 891. Thus, despite his nominal status as an employee, the court treated Bush as a dealer because his many responsibilities, including the authority to commit the grantor to a sale, gave him the right to sell the grantor's goods and use its commercial symbols.

Maye hails *Bush* as a breakthrough in extending the scope of the WFDL to include dealers who have the authority to do everything *but* unilaterally commit the grantor to a sale. We do not read the case so broadly. Though it is true that *Bush* looked to "the actual duties and responsibilities of each party" in finding a right to sell, *id.* at 653, 407 N.W.2d at 891, the court did not hold that a right to sell could exist in the absence of an independent right to commit the grantor to a sale. In fact, the opinion makes it clear that Bush *was* able to bind National to a sale: "As the court in *Foerster* recognized, the right to sell 'generally includes authority to commit the grantor to a sale....' In this case the record amply demonstrates that Bush had such authority." *Id.* at 654, 407 N.W.2d at 891. Thus *Bush* does not hold, as Maye would have us believe, that a dealer's responsibilities can be so substantial that it qualifies under the WFDL even though it is not able to commit the grantor to a sale. Though the court did not specifically say so, it appears that the most important factor in finding that Bush had a right to sell was his authority to commit the grantor to a sale. The *Wilburn* court firmly rejected Maye's contention that a right to sell could exist without such authority.

Under *Foerster*, it is not enough that Wilburn "did everything to sell the defendant's products but give final approval of the order." *Wilburn II [v. Jack Cartwright Inc.]*, 543 F.Supp. [174] at 177 [ (E.D.Wis.1982) ]. Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the WFDL; however, where a sales representative merely solicits orders that are subject to the manufactur-

er's approval, no such investment has occurred.

719 F.2d at 265.

The question, then, is whether Maye had an independent right to commit Nordson to a sale. First of all, the terms of the contract make it clear that Maye did not have the power to commit Nordson to a sale; paragraph 7 invests in Nordson the "sole discretion" to accept or reject a contract. But we cannot stop here. Just as the court in *Bush* looked beyond the "employee" label to determine the true nature of the dealer-grantor relationship, so we look beyond the letter of the contract. In this case Maye has the burden of demonstrating that, despite the restrictions in the contract, in the course of performing the contract Nordson gave Maye the right to commit it to a sale. *See Kornacki v. Norton Performance Plastics*, 956 F.2d 129, 132 (7th Cir.1992) ("Although it is possible that parties' course of performance may modify a written contract, a party asserting such a modification must provide some evidence of the modification."). Maye's attempts to prove that it was given the right to commit Nordson to a sale fall short. The record fails to disclose that Nordson ever surrendered its exclusive right to approve contracts. That Maye did more than required by the contract is insufficient to demonstrate a modification and a right to sell, as "the performance of additional service-type functions by a manufacturer's representative does not suffice to bring one which neither sells nor distributes goods within the meaning of [the WFDL]." *E.A. Dickinson & Associates v. Simpson Electric Co.*, 509 F.Supp. 1241, 1245 (E.D.Wis.1981); *see also Wilburn*, 719 F.2d at 265. While Maye had a great deal of contact with customers in soliciting business for Nordson, submitted orders for Nordson's approval, and did warranty work on Nordson products free of charge, there is no evidence that it had the ability to bind Nordson to a sale at the moment a customer agreed to buy. Absent this crucial authority, Maye does not have the right to sell under the WFDL.

Furthermore, Maye's duties make it look very much like a typical manufacturer's representative, a position consistently excluded from the WFDL. *See, e.g., Kornacki*, 956 F.2d 129; *Wilburn*, 719 F.2d 262; *Foerster*, 105 Wis.2d 17, 313 N.W.2d 60; *E.A. Dickinson & Associates*, 509 F.Supp. 1241. A manufacturer's representative has been defined as "an independent contractor who solicits orders for a manufacturer's product from potential customers and is paid a commission on resulting sales." M. Bowen & B. Butler, *The Wisconsin Fair Dealership Law*, § 3.13, at 3–18 (1988). Maye fits this description of a manufacturer's representative to a "T." The Agreement describes Maye as "an independent contractor" (¶ 11); it requires Maye to promote the sale and acceptance of Nordson goods—the equivalent of soliciting orders; and it provides for payment by commission. Agreement, ¶ 8. Thus, Maye meets all three parts of the definition of a manufacturer's representative. As a result, cases like *Kornacki, Foerster*, and *E.A. Dickinson*, all of which held that manufacturer's representatives who worked as independent contractors soliciting orders on a commission basis did not have the right to sell under the WFDL, support our conclusion that Maye did not have the right to sell Nordson products.

B. *Use of Commercial Symbols*

Maye also attempts to qualify as a dealer based on its (alleged) right to use Nordson's trademark and logo. Recently revisiting the issue of what constitutes a right to use a trademark, we said that "[i]n order to satisfy the requirements of the WFDL, a dealer must *prominently use and display* a grantor's logo." *Kornacki*, 956 F.2d at 134 (emphasis added). For example, owners of a Walgreen's drugstore paid for advertising using the Walgreen's trademark, paid for a large Walgreen's sign in the front of store, and paid for large Walgreen's signs and labels which it posted throughout the store. The court held that this use satisfied the WFDL, noting the plaintiff's shared Walgreen's interest in promoting its trademark and reputation, and that "[t]he Walgreen trademark im-

plied to the public that the plaintiff drug-stores furnished the type of quality service and low prices associated with the defendant." *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.,* 607 F.Supp. 155, 165–66 (W.D.Wis.1984), *aff'd in part and vacated in part* 761 F.2d 345 (7th Cir. 1985). Under *Kealey* and *Kornacki,* dealers must make prominent use of a grantor's trademark to qualify under the WFDL, such use that the public associates the dealer with the trademark.

■ Conversely, mere *de minimis* use of a trademark does not satisfy the WFDL. *Moodie,* 889 F.2d at 743. The reasoning here is that a minor investment in a grantor's trademark is unlikely to place the grantor in such a superior bargaining position that it could extract concessions from an unwilling dealer, and so the dealer does not need the protection of the WFDL. *See Kornacki,* at 134; *Moodie,* 889 F.2d at 743. Examples of non-qualifying, *de minimis* use of a grantor's trademark abound. In *Moodie* the plaintiff used business cards, pamphlets, and order forms supplied by the grantor and bearing the grantor's trademark, but he "did not prominently display the logo as a[n] implicit guarantee of quality and did not spend money on advertising." 889 F.2d at 743. In fact, it seems that the only use of the trademark was to identify Moodie as the grantor's agent. The court found that this *de minimis* use of the trademark was insufficient under the WFDL because "Moodie lacked the necessary investment in SBF's trademark to give SBF an 'inherently ... superior bargaining position.' Wis.Stat. § 135.025." *Id.* For other examples of *de minimis* use of a trademark, *see Kornacki,* at 134 (use of calling cards and brochures furnished by grantor, tempered with contractual prohibition on unauthorized use of the trademark, demonstrated that the plaintiff did not qualify as a dealer under WFDL); *Wilburn,* 719 F.2d at 265 (plaintiff not a dealer where he ran only one advertisement for grantor's goods and only tie-in with dealer's trademark occurred when he placed a sticker with his name and address on dealer's catalogs); *Foerster,* 105 Wis.2d at 30, 313 N.W.2d at 66 (use of calling cards and brochures sent by grantor, in conjunction with never advertising grantor's products, was insufficient).

■ The facts in this case fall in line with the cases holding that dealers did not qualify under the WFDL because their use of the grantor's trademark was *de minimis.* Like the plaintiff in *Kornacki,* Maye is forbidden by contract to appropriate any Nordson trademark to its own use. Agreement, ¶ 4g. Like the plaintiffs in *Moodie* and *Foerster,* Maye's only use of Nordson's trademark was in distributing thank you notes, pamphlets, and brochures designed and supplied by the grantor. Furthermore, similar to the plaintiff in *Wilburn,* Maye includes a letter written on its own stationery whenever it sends out a folder full of Nordson promotional materials, and the company president, John Maye, does not use the Nordson logo on his business card. Finally, Maye neither paid for nor engaged in any advertising using Nordson's trademark. *Compare Bush,* 139 Wis.2d at 654, 407 N.W.2d at 891 (extensive use of trademark on stationery, business cards, calendars, and pens, along with payment of half of advertising cost, equated to a right to use the grantor's trademark). The similarities between the facts in *Kornacki, Moodie,* and *Foerster* and Maye's situation are striking. Maye never did its own advertising or paid for Nordson's, never used any promotional materials besides those provided by Nordson, and used separate materials bearing only its own trademark, distinguishing itself from Nordson. On these facts Maye's use of Nordson's trademarks was merely *de minimis.* Maye's argument that when considered as a whole these activities satisfy the WFDL is contrary to courts' interpretations of the WFDL and neglects the rule that *de minimis* use is not enough.

■ Maye's alternative argument that its use of the trademarks satisfies the letter of the WFDL, and so is sufficient, is not so easily put aside. Though paragraph 7 of the Agreement prohibits Maye from appropriating Nordson's trademarks or patents, paragraph 15 *requires* Maye to promi-

nently display the appropriate Nordson trademark on any literature or promotional documents it produces. This would seem to satisfy the literal language of the WFDL, as Maye plainly has "the right to ... use a trade name, trademark, service mark, logotype, advertising or other commercial symbol." Wis.Stat. § 135.02(3). Maye argues that this ought to be enough, and some commentators have agreed. *See* M. Bowen & B. Butler, *The Wisconsin Fair Dealership Law*, § 3.19, at 3–33 (1988); Note, Foerster, Inc. v. Atlas Metal Parts—*The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected By the Wisconsin Fair Dealership Law*, 1985 Wis.L.Rev. 155, 191. Judicial interpretation of the WFDL, however, has made it clear that more is required than the mere right to use a commercial symbol, or even *de minimis* use. Rather, to meet the "prominently use and display" standard of *Kornacki*, a dealer must use the trademark or logo in a way that ties its fortunes to the reputation of the grantor, giving the grantor superior bargaining power that it might use to exploit the dealer. *See Moore v. Tandy Corp.*, 631 F.Supp. 1037, 1048 (W.D.Wis. 1986), *aff'd*, 819 F.2d 820 (7th Cir.1987). In this case, for example, Maye might have included Nordson's name in a Yellow Pages advertisement; it might have displayed a Nordson placard outside its warehouse; it might have painted the Nordson mark on the side of company vehicles; it might have paid for advertising using the Nordson trademark; or it might have mentioned Nordson on its company stationery. These actions do not necessarily involve a large financial investment. They do, however, require the dealer to consciously invest in the reputation of the grantor, making its reputation depend on the grantor's reputation. Maye, however, only used the trademark when it passed along materials sent to it by Nordson, such as pamphlets and brochures. These materials did not mention Maye, and Maye's letters on its own stationery would only serve to reinforce the distinction between the two companies. It is unlikely, then, that Maye's limited use of Nordson's trademarks did much to link the reputations of the two companies, especially where it did not "prominently use and display" Nordson's trademarks in such a way as to give Nordson superior bargaining power. Thus, Maye did not have the right to use Nordson's commercial symbols, and for that reason cannot be treated as a dealer under the WFDL.

## C. *Community of Interest*

 Maye makes the argument that even if it has neither the right to sell Nordson's goods nor the right to use its trademark, it can still qualify as a dealer if the two share a community of interest. It pins this argument on a perceived liberalization of the Wisconsin Supreme Court's interpretation of the WFDL. Whatever the trend, the Court has not re-written the statute. A community of interest between a dealer and a grantor is required before a dealer will be protected by the WFDL, but the mere fact that a dealer and grantor share a community of interest is not of itself sufficient to create a WFDL "dealership". *See Bong v. Cerny*, 158 Wis.2d 474, 485, 463 N.W.2d 359, 363–64 (1990) (community of interest cannot be implied from the right to sell; they are two distinct requirements, and both must be satisfied to come within the WFDL). Maye's argument that a community of interest alone is enough to create a dealership is rebutted by *Foerster*, which found no dealership existed even though the parties agreed that they shared a community of interest. 105 Wis.2d at 25, 313 N.W.2d at 64. Though the community of interest prong is the most malleable and policy-laden aspect of the dealership definition, it is still only one single segment of the three-part test, and unless there is also a contract and a right to sell or distribute the grantor's products or to use its commercial symbols there can be no dealership as defined by the WFDL.

The district court's denial of the preliminary injunction is

AFFIRMED.