In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2304

TIMOTHY J. VAN GROLL,

*Plaintiff-Appellant,*

v.

LAND O' LAKES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1013—**John W. Reynolds**, *Judge.*

ARGUED SEPTEMBER 13, 2002—DECIDED NOVEMBER 14, 2002

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* For 14 years, Timothy Van Groll put on his Land O' Lakes hat, shirt, and jacket, and carried milk in his truck, emblazoned with a Land O' Lakes logo, to a Land O' Lakes production facility. Van Groll says that made him a "dealer" entitled to protection under Wisconsin's Fair Dealership Law (WFDL). The district court judge, the late John W. Reynolds,[1] disagreed: he

---

[1] John W. Reynolds, who passed away on January 6, 2002, at the age of 80, had a spectacular career of public service. As Wisconsin's attorney general and governor, and later as a judge (for almost 37 years) on the United States District Court for the Eastern District of Wisconsin, his fingerprints are all over the state's history for the last half of the 20th century. All those who knew and loved Judge Reynolds would give anything to just once more hear his familiar "Hey, I'm John Reynolds from Green Bay. Where were you born and raised?"

granted Land O' Lakes' motion for summary judgment, a decision we review today on Mr. Van Groll's appeal.

Land O' Lakes, Inc. is a Minnesota cooperative that produces and distributes milk, butter, cheese, and other dairy products. Van Groll began transporting raw milk from farmers to Land O' Lakes' Denmark, Wisconsin, production facility in 1986 as an employee of a fellow named Lauren Vander Kintner. In 1990 Van Groll paid $25,000 to Vander Kintner and the two formed a partnership. Six years later, Van Groll bought out Vander Kintner's share of the partnership for $30,000.

In January of 1996, when his buyout of Vander Kintner became final, Van Groll and Land O' Lakes agreed to a deal giving Van Groll's trucking company, creatively named Tim Van Groll Trucking, exclusive rights to haul milk from 12 to 30 farmers within 25 miles of the Denmark facility. The contract was automatically renewable for successive 1-year terms, and either party could terminate it by providing notice of termination 30 days prior to the end of the current term. Land O' Lakes paid to install its logo on Van Groll's truck and required Van Groll to wear a Land O' Lakes uniform while hauling its milk. Van Groll also followed the safety and cleanliness policies set out in a Land O' Lakes manual.

Although Land O' Lakes did not require Van Groll to own his own equipment, Van Groll bought a truck in 1996 for $40,000. He also owned a semi-truck that he used to haul cheese to the east coast. The milk and cheese operations produced roughly the same revenues (approximately $140,000 each in 1998), though he spent most of his time on, and earned most of his profits from, his milk hauling contract with Land O' Lakes.

Van Groll's compensation depended on the volume of milk, its grade, mileage, geographic region, and the size of the farm from which the milk was hauled. He also

received a 10 percent fee for delivering detergents and other supplies to the producers on his route. Van Groll did not inventory or take title to any milk he hauled, nor did he sell any dairy products for Land O' Lakes. Land O' Lakes never paid Van Groll for deliveries of butter, cheese, and other products that he made to the producers for their personal consumption.

By 1999 Land O' Lakes sought to terminate the agreement with Van Groll. That spring, knowing that Land O' Lakes would end its dealings with him in January 2000, Van Groll was the only Land O' Lakes hauler to reject a generous severance package offered if he would agree to cancel the contract early. In the months that followed, Land O' Lakes transferred some of the customers on Van Groll's route to other haulers. On November 19, 1999, Land O' Lakes sent Van Groll a letter terminating the agreement, and the relationship ended, 4 years after it had started, in January 2000.

We review a grant of summary judgment *de novo*, viewing all of the facts, and drawing all reasonable inferences therefrom, in favor of the nonmoving party. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 815 (7th Cir. 2002). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under the WFDL, "a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances." Wis. Stat. § 135.04. Van Groll claims Land O' Lakes violated the notice provision by substantially changing the circumstances of their contract and in terminating the agreement. Judge Reynolds held that

the notice provision did not apply because Van Groll was not a "dealer" under the WFDL. Van Groll's appeal can only succeed if this determination was wrong.

A "dealer" under Wisconsin law is "a grantee of a dealership situated in [Wisconsin]." Wis. Stat. § 135.02(2). A "dealership" requires:

1.  A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons;

2.  by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol;

3.  in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). We need only consider the second element, which Van Groll claims his business satisfies because Land O' Lakes granted him the right both to distribute goods and use its trademark.

The WFDL is intended "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Wis. Stat. § 135.025(2)(b). *See also John Maye Co. v. Nordson Corp.*, 959 F.2d 1402, 1405 (7th Cir. 1992) ("The WFDL is intended to protect small businesses (dealers) that deal in the goods or services of a larger company (grantor) and which, because of the link between their economic health and their ability to deal in the grantor's goods or services, are in an inferior bargaining position and could be unfairly exploited by the grantor."); *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir. 1990) ("We have deduced from

the structure and history of the statute a central function: preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand."). The statute should be "liberally construed . . . to promote its underlying remedial purposes and policies." Wis. Stat. § 135.025(1).

Van Groll argues that "dealer" should be read so broadly as to include a hauler who has made little investment into the specific product or brand he hauls. He relies on *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739 (7th Cir. 1989), where we held that a truck driver who delivered books to school book fairs was a "dealer" within the meaning of the WFDL. Under the written agreement in that case, defendant SBF required Moodie to maintain a place to store the books and a truck to haul the books. Moodie, who was the exclusive area "distributor" under the contract, handed out business cards and other materials featuring the SBF trademark.

Land O' Lakes points to *Rakowski Distributing, Inc. v. Marigold Foods, Inc.*, 193 F.3d 504 (7th Cir. 1999), where we held that a milk hauler who had not made a substantial investment was not a "dealer" under the WFDL:

Unlike Moodie, Rakowski was not required to purchase trucks or to build storage facilities in order to satisfy the agreement, even though Rakowski found it convenient to do so. As far as the record shows, Marigold would have been equally satisfied if Rakowski had leased its trucks and facilities, as long as the products reached its customers in a timely and safe manner. By making the capital expenditures it did, Rakowski was able to increase its profits at the same time as it served Marigold more effectively. Perhaps most important, unlike Moodie, Rakowski's responsibilities under the hauling contract were lim-

ited to transporting Marigold products to Marigold's customers. Rakowski did not maintain its own inventory of Marigold's products, place Marigold products on customer shelves, monitor customer inventories, or schedule future deliveries.

*Rakowski*, 193 F.3d at 508. We found Rakowski's situation to be less like Moodie's and more like that of the plaintiff in *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 300 N.W.2d 63 (1981), where the Wisconsin Supreme Court found that a strictly limited cartage service was not a dealer where a trucking company merely picked up packages from customers and dropped them off at a central location.

Van Groll suggests his case is more like *Moodie* and less like *Rakowski* or *Kania*. The facts suggest otherwise. First, Van Groll argues that he lost the substantial investment he made to secure the Land O' Lakes contract. Specifically, he points to the $55,000 he gave to Vander Kintner, first to form a partnership and then to assume full control of it, and the $40,000 he spent in 1996 to buy a new truck.

Van Groll now claims that Land O' Lakes insisted that he buy out Vander Kintner because Land O' Lakes management did not like him and did not like dealing with partnerships. In his deposition, however, Van Groll admitted both that he wanted to buy out Vander Kintner and that, had he not bought out Vander Kintner, the partnership likely would have continued hauling milk for Land O' Lakes. Therefore, the $55,000 he gave to Vander Kintner was simply a business decision Van Groll made; it was not an investment in his relationship with Land O' Lakes.

As for the cost of the truck, Land O' Lakes never required Van Groll to own his own equipment. As far as it was concerned, it could have been leased. Van Groll claims leasing was not economically feasible, but most of Land O' Lakes' other haulers chose to do just that. In fact,

Land O' Lakes offered a program designed to help its milk haulers lease equipment at below-market rates.

In addition, Van Groll's claim that his truck could not be converted for other uses simply shows that he invested in his trucking business, not in his relationship with Land O' Lakes. While the truck was specially equipped to haul milk, there is no reason Van Groll could not have accepted another job hauling milk for any of the many other dairies or haulers in the area. Moreover, Van Groll sold his truck in 2000 for its fair market value of $23,000, suggesting that there were viable uses for it.

Next, Van Groll notes a number of other factual differences between his situation and the one in *Rakowski*, but none of those differences makes Van Groll any more of a dealer under the WFDL. First, Van Groll claims he had a formal grant of an exclusive territory, something Rakowski lacked. Rakowski, however, "was Marigold's exclusive Chicago-area hauler." *Rakowski*, 193 F.3d at 505-06. The difference in the formality of the agreement, if such a difference even existed, matters little since the two had the same exclusive rights in practice.

Next, Van Groll, citing his noncompete clause and the instruction manual Land O' Lakes gave him, claims that his interests were more intertwined with Land O' Lakes' than those in *Rakowski*. Although it is important to consider the parties' entire relationship, *Rakowski*, 193 F.3d at 509 (Ripple, J. dissent), the noncompete clause and the instruction manual here are not sufficient to establish a dealership. The noncompete clause applied only to the member farmers Van Groll served; he was free to deliver milk to or from anyone else. As such, his relationship with Land O' Lakes did not preclude his finding work after Land O' Lakes terminated the relationship. Additionally, much of the manual consisted simply of applicable federal and state regulations. The "control" Van

Groll claims Land O' Lakes exerted over him consisted mainly of requiring Van Groll to wear a clean uniform and to keep the milk clean while dropping it off at the Denmark facility.

Finally, Van Groll attempts to distinguish *Rakowski* based on the fact that, while neither driver carried an inventory, Van Groll did not carry an inventory because there was no logical or economic reason for him to do so. While a dealer need not necessarily keep an inventory, the fact that Van Groll has an excuse for not keeping one does not, by itself, make him a dealer.

In addition to claiming that he distributed goods, Van Groll argues that his business qualifies as a dealership because of his use of the Land O' Lakes trademark. For the use of a trademark to make a business a dealership under the WFDL, "more is required than the mere right to use a commercial symbol, or even *de minimus* use." *John Maye Co.*, 959 F.2d at 410. A plaintiff must make a "substantial investment in the trademark." *Moodie*, 889 F.2d at 743. In *Moodie*, we explained the reason for requiring investment:

> The rationale behind this holding is that *de minimus* investment in a trademark is not sufficient for the alleged dealer to be "over the barrel" so as to warrant protection under the WFDL. As the WFDL protects dealers who face inherently superior bargaining power, those dealers with only a *de minimus* investment in the grantor's trademark are not implicated.

*Moodie*, 889 F.2d at 743. There, we held that the mere use of business cards did not amount to a "substantial investment," even though the plaintiff at times printed his own cards. 889 F.2d at 743. *See also Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 20, 313 N.W.2d 60 (Wis. 1981) (holding that "there must be more than the mere use of a calling card identifying a manufacturer's

representative as an agent for a company before such representatives are 'dealerships.'").

Similarly, in *Rakowski*, we held that the plaintiff, who had a Marigold logo on his truck and handed out Marigold business cards and other materials, did not have a right to use Marigold's trademark, even though the plaintiff paid part of the cost to install the logo onto his truck.

Simply put, defining "dealership" in terms of trademark use is meant to protect against situations in which a dealer spends money advertising for or promoting a company, an investment that is lost when the company terminates the relationship. *See generally John Maye Co.*, 959 F.2d at 1405. Van Groll made no such investment in Land O' Lakes. Land O' Lakes paid all of the costs of putting a logo on Van Groll's truck, and Land O' Lakes provided Van Groll with his uniform.

Van Groll also claims the $55,000 he paid Vander Kintner was for the right to use the Land O' Lakes trademark. That investment, however, was a simple start-up cost of Tim Van Groll Trucking and was not tied to the Land O' Lakes logo at all. Again, the truck and rights he received from Vander Kintner could have been used to haul milk for any company, not just Land O' Lakes, so that investment was not lost when Land O' Lakes terminated the contract. Using Van Groll's logic, any money invested into his trucking business would have been an investment in the logo, a result the WFDL never intended. *See generally John Maye Co.*, 959 F.2d at 1405; *Foerster*, 105 Wis. 2d at 20-21, 313 N.W. at 66-67.

In sum, we agree with Judge Reynolds' conclusion that "Van Groll cannot distinguish *Rakowski* in any material way." Because Land O' Lakes did not grant Van Groll the right to distribute goods or to use its trademark, we do not need to reach the question of whether there

was a community of interest between the parties, the final hurdle that would have to be cleared before a reversal of the summary judgment order could be granted. Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*