In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-3484

PMT MACHINERY SALES, INC.,

*Plaintiff-Appellant,*

*v.*

YAMA SEIKI USA, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:17-cv-1731— **J.P. Stadtmueller**, *Judge.*

_____

ARGUED SEPTEMBER 18, 2019 — DECIDED OCTOBER 28, 2019

_____

Before KANNE, HAMILTON, and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. A company that enters a dealership agreement with a manufacturer takes a risk. Investing in the sale of the manufacturer's products may generate significant profits. But if a manufacturer pulls out, a dealer who has made that investment may be left high and dry. To give dealers some protection, the Wisconsin Fair Dealership Law makes it difficult for manufacturers to simply walk away. If a manufacturer terminates, substantially changes, or fails to

renew a dealership agreement without good cause, the statute entitles the dealer to relief.

PMT Machinery Sales sued Yama Seiki for violating this statute. According to PMT, it had an exclusive-dealership arrangement with Yama Seiki, which the latter breached by using other companies to promote the sale of its machines. Yet PMT has failed to show that it had any dealership agreement with Yama Seiki, much less an exclusive one. To qualify as a dealership under the statute, PMT must have either possessed the right to sell or distribute Yama Seiki's products or made more than de minimis use of Yama Seiki's corporate symbols. But PMT never stocked any of Yama Seiki's products, collected money for their sale, or made more than de minimis use of Yama Seiki's logos. Because no reasonable jury could render a verdict in PMT's favor, we affirm the district court's grant of summary judgment in favor of Yama Seiki.

I.

Yama Seiki is a California manufacturer of machine tools. PMT, a Wisconsin corporation, sought to become the exclusive dealer for Yama Seiki turning machines in eastern Wisconsin. To that end, it negotiated with Clive Wang, the operations manager of the division that makes the machines. The parties disagree about whether Wang orally granted exclusive-dealer status to PMT in the course of these discussions, but they agree that Wang issued an exclusive letter of dealership to PMT in December 2015. This letter conditioned exclusive-dealer status on terms that included meeting sales requirements of $1,000,000 or 15 machines in a year, stocking one machine on PMT's showroom floor, and developing a marketing plan for the machines.

PMT rejected the letter because it did not believe it could reach the sales requirements. But two months later, PMT offered to take stock of two machines in exchange for an exclusive-dealer agreement. PMT followed this offer with an application for dealership status and a proposal to negotiate further. Wang did not address the offer; instead, he responded that he was "not sure if you are aware that you are in 'exclusive' status" to sell Yama Seiki turning machines. PMT believed that this communication amounted to an exclusivity agreement with open-ended terms.

PMT never took stock of any machines, but it did facilitate their sale by soliciting customers, negotiating sales prices, and connecting the customers with Yama Seiki. The customers then paid Yama Seiki, after consenting to its usual sales terms. PMT was then responsible for installation and warranty work, which it subcontracted to its sister company. When a sale was completed, Yama Seiki paid PMT the difference between the negotiated sales price and the dealer price. The parties disagree about whether Yama Seiki was required to fulfill every order facilitated by PMT, but they agree that Yama Seiki never in fact rejected a PMT order.

Between the start of 2015 and May 2018, PMT derived 55% of its income and 74% of its profits from Yama Seiki sales, the remainder apparently coming from sales of other machine tools and accessories. PMT spent $3,803.14 on advertising during the alleged exclusive-dealership period, though only $1,200 of this is identified as specifically related to Yama Seiki products. PMT did not operate its own website but was instead included as part of its sister company's site. The section of the site related to machine sales used the Yama Seiki logo

and advertised Yama Seiki products alongside tools and accessories from other manufacturers.

More than a year after Wang told PMT that it was in "exclusive status," PMT discovered that others were selling Yama Seiki turning machines in eastern Wisconsin. PMT approached Wang, who stated that PMT was "not [an] exclusive distributor," citing its rejection of the letter outlining the sales requirements. PMT then sued Yama Seiki, alleging that it had violated Wisconsin's Fair Dealership Law, WIS. STAT. §§ 135.03–135.04, by breaching an exclusive-dealership agreement. Yama Seiki moved for summary judgment on the ground that PMT was not a dealership under the statute. The district court determined that PMT had not raised a triable issue on the dealer-status question and granted the motion.

## II.

The Wisconsin Fair Dealership Law provides that "grantors" may not "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." WIS. STAT. § 135.03. The statute's protections, however, extend only to "dealerships," and a "dealership" is defined as:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing

goods or services at wholesale, retail, by lease, agreement or otherwise.

*Id.* § 135.02(3)(a). Wisconsin courts "have typically divided the statutory language into three parts: (1) the existence of a contract or agreement between two or more persons; (2) by which a person is granted one of the rights specified; and (3) in which there is the requisite 'community of interest.'" *Benson v. City of Madison*, 897 N.W.2d 16, 27 (Wis. 2017).

The district court resolved the case on the second prong. It held that PMT failed to establish that it was granted either of the rights specified by the statute: (1) the right to sell or distribute the manufacturer's goods, or (2) the authorization to "use a trade name, trademark, service mark, logotype, advertising or other commercial symbol." WIS. STAT. § 135.02(3)(a).

To defeat summary judgment, a party must present a "genuine dispute" of material fact such that a reasonable jury could find in its favor. FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Under this standard, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010); *see also Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997) ("A party 'may not defeat a properly focused motion for summary judgment' by relying on evidence that is 'less than significantly probative.'" (citation omitted)). PMT has not presented a genuine dispute about whether it had a right to sell Yama Seiki's machines or made more than de minimis use of Yama Seiki's corporate symbols.

A.

The Wisconsin Supreme Court has defined the "right to sell or distribute" as "the 'unqualified authorization to transfer the product at the point and moment of the agreement to sell' or the 'authority to commit the grantor to a sale.'" *Benson*, 897 N.W.2d at 29 (quoting *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 64 (Wis. 1981)). Consistent with this guidance, we have emphasized that the "single most important factor" for a dealer's "right to sell" is its "ability to transfer the product itself (or title to the product) or commit the grantor to a transaction at the moment of the agreement to sell." *John Maye Co. v. Nordson Corp.*, 959 F.2d 1402, 1406 (7th Cir. 1992). Here, PMT was not responsible for either delivering the machines or transferring title. It nonetheless contends that it had the right to sell or distribute because it was authorized to commit Yama Seiki to a sale. As support, PMT relies on the undisputed fact that Yama Seiki never rejected a sale arranged by PMT.

But PMT must do more than assert that Yama Seiki's silence amounted to an agreement to follow through on every sale that PMT arranged. To satisfy the second prong of the test, PMT must show that it exercised significant control over the sales process. As both we and the Wisconsin Supreme Court have explained, the hallmarks of such control include transfer of title to customers, maintenance of inventory, approval of sales terms, and collecting payment. PMT—which functioned much more like a manufacturer's representative than a dealership—assumed none of these responsibilities.

In *Benson v. City of Madison*, the Wisconsin Supreme Court outlined the degree of control that a dealership must have over the transaction to qualify for the statute's protections.

That case involved golf pros who were tasked with operating various courses in a city, selling merchandise and concessions on the courses, and hiring support staff. *Benson*, 897 N.W.2d at 19–20. In holding that the pros qualified as dealers, the court emphasized that it was "most important[]" for this determination that a customer "paid her greens fee to the Golf Pro" which was then "remitted … to the City." *Id.* at 29. But the court also highlighted other aspects of the golf pros' role demonstrating the extent of their control over the transaction, including the authority to operate rental services, make staffing decisions, and set some prices. *Id.* at 20, 29.

*Benson* built upon earlier cases identifying the hallmarks of the right to sell. In *Foerster, Inc. v. Atlas Metal Parts Co.*, the Wisconsin Supreme Court held that simply facilitating sales of a manufacturer's products was the role of a "manufacturer's representative," not a dealer. 313 N.W.2d at 61. Focusing on the process of the order, the court emphasized that the manufacturer had "assumed total control of the transaction" by accepting or rejecting orders, negotiating sales terms, making credit arrangements, and receiving payments. *Id.* at 62. At no point did the plaintiff stock, take possession, or distribute the manufacturer's products. *Id.* at 64–66.

In *John Maye Co. v. Nordson Corp.*, we concluded that an entity performing a role similar to that of PMT was a manufacturer's representative rather than a dealership under Wisconsin law. In that case, John Maye was responsible for "transmitt[ing] customer orders or inquiries to Nordson for approval," "provid[ing] assistance and advice to Nordson customers," bearing "all of its own expenses," "recogniz[ing] Nordson's exclusive ownership" of its corporate symbols, and ensuring "that any price quotations contain[ed]

Nordson's standard conditions of sale." *John Maye*, 959 F.2d at 1404. Nordson had "sole discretion to accept or reject any order." *Id.* (internal quotation marks omitted). We held that no dealership relationship existed. In doing so, we rejected the argument that significant delegation of responsibilities could create the requisite relationship absent an affirmative right to commit a grantor to a sale or the authority to transfer possession or title. *Id.* 1407.

It is undisputed that Yama Seiki never refused a sale arranged by PMT. But PMT presented no evidence that Yama Seiki was duty-bound to honor every sale that PMT arranged. Nor did PMT show that it exercised the requisite control over the sales transactions. At no point did any money pass from a customer to PMT—the factor that the Wisconsin Supreme Court identified as "most important[]" in *Benson*. *See* 897 N.W.2d at 29. Nor did PMT maintain stock of Yama Seiki machines, possess the ability to transfer title, or have the authority to negotiate sales terms. Instead, PMT's role was very similar to that of the plaintiffs in *John Maye* and *Foerster*: it solicited customers, negotiated prices, and provided support after delivery. Yama Seiki maintained control over the transaction by coordinating sales terms with customers, collecting payment, and executing delivery. Because PMT did not demonstrate that it had the right to sell Yama Seiki's products, it does not qualify for the statute's protections.

## B.

Even though PMT lacked the right to sell, it could still qualify as a dealer if it made substantial use of Yama Seiki's commercial symbols. For an entity to qualify as a "dealership" through the use of commercial symbols, "more is required than the mere right to use a commercial symbol." *John Maye*,

959 F.2d at 1410; *see also Foerster*, 313 N.W.2d at 67 ("[T]here must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company …."). Instead, a dealership must either put those symbols to "such use that the public associates the dealer with the trademark," *John Maye*, 959 F.2d at 1409, or "prominently display the logo as a[n] implicit guarantee of quality." *Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 743 (7th Cir. 1989). Such use by a dealership "ties its fortunes to the reputation of the grantor, giving the grantor superior bargaining power that it might use to exploit the dealer." *John Maye*, 959 F.2d at 1410. Use of a logo or trademark that does not rise to this level is de minimis and "not sufficient to satisfy the WFDL." *Moodie*, 889 F.2d at 743.

Sufficiently substantial use of a grantor's corporate symbol typically requires a purported dealer to "make a 'substantial investment in the trademark.'" *Van Groll v. Land O' Lakes, Inc.*, 310 F.3d 566, 570 (7th Cir. 2002) (citation omitted). The commercial-symbols form of the dealership definition serves "to protect against situations in which a dealer spends money advertising for or promoting a company" only for that investment to be "lost when the company terminates the relationship." *Id.* In that scenario, the power imbalance between parties is at its greatest because the dealer has the most to lose. By contrast, where a dealer has only made "*de minim[i]s* investment in a trademark" the pressure "is not sufficient for the alleged dealer to be 'over the barrel' so as to warrant protection under the WFDL." *Moodie*, 889 F.2d at 743; *see also John Maye*, 959 F.2d at 1409 ("[A] minor investment in a grantor's trademark is unlikely to place the grantor in such a superior bargaining position that it could extract concessions from an

unwilling dealer, and so the dealer does not need the protection of the WFDL.").

PMT presented scant evidence of a "substantial investment" in Yama Seiki's corporate symbols that might be lost by termination of the relationship. It relied primarily on its use of Yama Seiki logos on its website, arguing that this use is not de minimis due to the modern importance of internet commerce. This argument was poorly developed and arguably waived on appeal. However online trademark use might play out under the WFDL in another case, we agree with the district court that PMT's use of Yama Seiki's logo did not involve a substantial investment that would leave it "over the barrel" if Yama Seiki pulled the plug. *Moodie*, 889 F.2d at 743. The only investment that PMT identified is its expenditure of $3,803.14 for advertising. But apart from the modest $1,200 spent on advertising efforts made cooperatively with Yama Seiki, PMT failed to show how much of its money was spent on Yama Seiki products, as opposed to other products that it carried. PMT's investment was not sufficient to create an imbalance of power between it and Yama Seiki and therefore does not qualify it for protection under the statute.

* * *

PMT has failed to establish that it had the right to sell Yama Seiki's machines or use Yama Seiki's trademarks in such a way that it would entitle it to the protections of the Wisconsin Fair Dealership Law. We therefore AFFIRM the district court's grant of summary judgment.